# In the United States Court of Federal Claims

### No. 17-220C
### (Filed: September 30, 2019)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | **Rule 12(b)(1); Motion to Dismiss;** |
| **KUWAIT PEARLS CATERING** | * | **Fifth Amendment Taking; Standing;** |
| **CO., WLL,** | * | **Substantial Connections of Foreign** |
| | * | **Plaintiff to United States; 28 U.S.C.** |
| **Plaintiff,** | * | **§ 1502; United States-Iraq Status of** |
| | * | **Forces Agreement** |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * | | |

Murphy S. Klasing, Tanta N. Garrison, Weycer, Kaplan, Pulaski & Zuber, PC, 11 Greenway Plaza, Suite 1400, Houston, Texas 77046, for Plaintiff.

Chad A. Readler, Robert E. Kirschman, Jr., L. Misha Preheim, Nathanael B. Yale, and Zachary J. Sullivan, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

---

### OPINION AND ORDER DENYING
### DEFENDANT'S MOTION TO DISMISS

---

**WILLIAMS**, Senior Judge.

This Fifth Amendment takings case comes before the Court on Defendant's motion to dismiss for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. Plaintiff Kuwait Pearls Catering Co., WLL ("KPCC") is a subcontractor that provided dining services to the United States military in Iraq. KPCC alleges that in December 2011 the Government effected a Fifth Amendment taking of its property by physically excluding it from a temporary dining facility ("DFAC") its predecessor built and KPCC operated, and by preventing its continued performance under its subcontract. KPCC seeks compensation equal to the value of the facility and equipment.

The Government argues that KPCC's taking claim should be dismissed for lack of subject-matter jurisdiction because KPCC, as a foreign company, did not possess sufficient substantial connections with the United States to recover under the Takings Clause. The Government also argues that the Court does not possess jurisdiction to entertain KPCC's claim under 28 U.S.C. §

1502, which prevents the Court from exercising jurisdiction over "any claim against the United States growing out of or dependent upon any treaty." Alternatively, the Government argues that KPCC has failed to plausibly allege a cognizable property interest and that KPCC's claim presents a nonjusticiable political question.

This Court finds that KPCC has established that it possessed substantial connections with the United States by voluntarily providing a dining facility and related services directly to United States military personnel on a United States base, submitting to extensive United States control of its operations and personnel, and adhering to United States laws and regulations. KPCC has plausibly alleged a cognizable property interest in the dining facility and associated equipment, and KPCC's claim is not dependent upon a treaty. Although the United States did enter an executive agreement with Iraq governing the withdrawal of United States troops, the property KPCC claims--its dining facility and equipment--were not subject to the agreement, as the dining facility was relocatable. The Court further finds that KPCC's action presents a justiciable question--a monetary takings claim, not a challenge to the political determination to enter into the SOFA. As such, the Government's motion to dismiss is denied.

### Findings of Fact[1]

On December 14, 2001, prior to the start of the Iraq War, Brown & Root Services and the United States Department of the Army entered into Contract No. DAAA09-02-D-0007, in support of the Army's Logistics Civil Augmentation Program. Am. Compl. ¶ 6. The contract, known as LOGCAP III, required Brown & Root to provide logistical support services, including dining services, to United States forces. Id. On August 1, 2003, following the start of the Iraq War, "LOGCAP III was novated and transferred from Brown and Root Services to Kellogg Brown & Root Services, Inc. ("KBR")." Id.

In August 2006, Tamimi Global, a Saudi Arabian corporation and parent corporation of KPCC, entered into a subcontract with KBR to construct the DFAC at the FOB Warrior (C7) United States Army base in Kirkuk, Iraq. Am. Compl. ¶ 8; Hr'g Tr. 96, 128, 131. Tamimi Global, using its own funds, commenced construction in December 2006, and completed construction on March 6, 2008. Am. Compl. ¶ 10; Hr'g Tr. 131-32. After the opening of the dining facility in July 2007, Tamimi Global was substituted with KPCC, a Kuwaiti wholly owned subsidiary of Tamimi Global, to provide catering services to the United States Army. Am. Compl. ¶ 1; Hr'g Tr. 131, 133.

The DFAC was a temporary and portable structure that could be assembled and disassembled as needed. Am. Compl. ¶ 11; Hr'g Tr. 120, 164-65, 220. The facility was placed on a concrete pad with an overhead cover positioned approximately four or five feet above the building to protect against bomb attacks. Hr'g Tr. 220-21. Removing this overhead cover, made of glass and fused to steel pillars, was expensive, but not impossible. Hr'g Tr. 83, 220-21. Removal of the DFAC would leave the Government with a large, protected area suitable for a variety of uses. Hr'g Tr. 220-21.

---

[1]     These findings are derived from the record developed during an evidentiary hearing on jurisdiction held on May 9, 2018, and the appendices and exhibits to the parties' motions papers.

On November 17, 2008, the United States and the Republic of Iraq entered into an executive agreement, titled "Agreement Between the United States of America and the Republic of Iraq On the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq," ("SOFA") which governed the continued presence and formal withdrawal of American military forces in Iraq. Def.'s Mot. to Dismiss, App. 1. Article 5 of the SOFA states "Iraq owns all buildings, non-relocatable structures, and assemblies connected to the soil that exist on agreed facilities and areas, including those that are used, constructed, altered, or improved by the United States Forces." Id. App. 4. The SOFA defined "agreed facilities and areas" to include "those Iraqi facilities and areas owned by the Government of Iraq that are in use by the United States Forces during the period in which this Agreement is in force." Id. App. 2. The SOFA provided that "[t]he United States Forces and United States contractors shall retain title to all equipment, materials, supplies, relocatable structures, and other movable property that was legitimately imported into or legitimately acquired within the territory of Iraq in connection with this Agreement." Id. App. 6. The SOFA took effect on January 1, 2009. Id. App. 31.

On September 1, 2010, KPCC entered into Subcontract No. GCA90M-VC-SDF0920, ("Facility Agreement") with KBR to provide dining facility services at the Kirkuk base. Am. Compl. ¶ 11. The Facility Agreement provided that KPCC was to "provide all labor, materials, equipment, transportation, insurance, supervision, permits, supplies, documentation, inspection, protective personal equipment, quality control and all other things necessary to construct and/or operate a dining facility." Pl.'s Ex. 46 at 1, 4. The Facility Agreement defined the "Contractor" as KBR, the "Subcontractor" as KPCC, and the "Owner" or "Client" as the United States Government. Id.

The Facility Agreement provided that KBR would lease the DFAC to the Government for a monthly sum of $43,750 and contained an option for KBR to purchase the DFAC. Pl.'s Ex. 46 at 7. The Facility Agreement stated that "because these services are being performed on a US Military controlled installation, though outside United States territorial boundaries, all laws of the United States apply to the operation of this service, to include but not limited to, OSHA and the Rules and Regulations of the Environmental Protection Agency." Id. at 13. The Facility Agreement also provided for "demobilization" of the DFAC, which meant that all KPCC's property had to be removed and the land returned to its pre-construction condition. Pl.'s Ex. 46 at 11; Hr'g. Tr. 151. The Facility Agreement also required that demobilization be completed "no later than 30 days after last meal served upon coordination with CONTRACTOR," and "include removal of all SUBCONTRACTOR-owned assets." Id. at 8, 11.

In April 2011, KBR began negotiating to purchase the DFAC from KPCC. Hr'g Tr. 58, 246. These negotiations proved unsuccessful, as KPCC was seeking $6,500,000, while the Army claimed it could not pay over $750,000.[2] Pl.'s Ex. 15. By June 2011, with KPCC "not budging on the price," the Army considered having KPCC remove the DFAC entirely to enable the Army

---

[2]     Kathie Potter, an Army contracting officer, testified that local Army officials in Iraq had authority to approve "minor construction" projects only, which 10 U.S.C. § 2805 defined as projects costing $750,000 or less. Hr'g Tr. 211, 248. Anything higher than $750,000 was "major construction" requiring approval from the Army Corps of Engineers. Hr'g Tr. 248.

to build another structure on the concrete pad; however, this plan was never executed.  Pl.'s Ex. 17.

No concrete action regarding the DFAC was taken for the next several months.  Sometime in October 2011, Army legal counsel determined, without explanation in the record, that the DFAC was real (and non-relocatable) property and, pursuant to the SOFA effective in 2009, was the property of the Government of Iraq.  Pl.'s Ex. 27 at US-0000057.  According to the Army, this finding negated any requirement for KBR to purchase the DFAC from KPCC.  Id. at US-0000058.

The Army's legal position that the DFAC qualified as non-relocatable real property contradicted KPCC's subcontract which provided for the DFAC's removal.  Pl.'s Ex. 46 at 11.  Further, the Army had considered having the DFAC removed entirely just a few months earlier.  Pl.'s Ex. 17 at US-00009011.  Mark Mower, an Army contracting officer, stated in an October 11, 2011 email,"[u]nderstand we have a legal determination . . . that these [DFACs] are real property and cannot be removed.  Also understand the contract of the [subcontractor] who owns them states they must dismantle and remove the facilities."  Id. at US-0000060.  The next day Kathie Potter, another Army contracting officer, pointed out that the Army had in fact purchased two other DFACs the previous year.  Id. at US-0000058.  Ms. Potter stated in an October 12, 2011 email:

> I've been trying to get [KPCC's DFAC and another DFAC owned by a different subcontractor] purchased for some time . . . [Army legal] non-concurred on the purchase of the two DFACs indicating that these were real property and said we did not have the authority to purchase.  Big surprise since we purchased two last year.  However, no one can find copies of the legal opinion from last year.

Id.  The only hint of a rationale for the Army's decision is contained in Army attorney-advisor Richard Murphy's reply:

> I can't direct you to a legal opinion on [those purchases] as our office wasn't asked to concur.  We advise [the Army] that equipment affixed and a permanent part of the building would be considered real property.

Id. at US-0000057.

This is the entirety of the Army's justification.  KBR's Senior Manager of Procurement for Subcontracts, Frederick Nolton Bull, voiced opposition to the Army's legal conclusion that the DFAC was nonrelocatable.  In an October 12, 2011 email, Mr. Bull stated:

> I am not an attorney, however . . . [b]oth subcontracts [the 2006 subcontract for KPCC's DFAC and another subcontract with a different party] contain provisions for the subcontractor to demobilize their facility and be paid for demobilization.  I am assuming the USG legal group is using the [SOFA] as their basis for leaving the facilities in place . . . [in m]y opinion, the subcontractors are due equitable compensation.

Id. at US-0000058.

In an October 18, 2011 email to Ms. Potter and other Army officials, Mr. Bull laid out his argument for why the DFAC was relocatable and not real property.  Pl.'s Ex. 33 at US-0000082-

83.   Mr. Bull reiterated that the terms of KPCC's subcontract "allow the subcontractor to demobilize the facility because they own it." Id. at US-0000083.  He pointed that out that in 2010, the Army had completely disassembled two DFACS and reassembled them at new locations, including one from the same base as KPCC's DFAC.  Id.  Mr. Bull noted that the United States Department of State was then in the process of relocating another DFAC, complete with the protective overhead cover, stating "the reconstruction project is very visible when you drive through [the base].  Again being relocatable [the DFACs] are personal property." Id.  Finally, he added that the Army had purchased two DFACs in 2010, "and apparently the [Army] legal opinion supported that action."  Id.  Mr. Bull testified to these facts during the evidentiary hearing held May 9, 2018, and reiterated his view that the DFAC, being relocatable, was "not real property." Hr'g. Tr. 79-88.

Despite KBR's Subcontract Procurement Manager's arguments, on November 1, 2011, the Army sent a memorandum to KBR with the subject line "Determination of Dining Facilities at Kirkuk and Tikrit as Real Property and DFAC Equipment as Personal Property."  Pl.'s Ex. 37.  The memorandum stated that the DFAC was "evaluated to be 'real property'" and that the Army was unable to purchase the facility "because ownership rests with the owner of the land, the Government of Iraq (GOI)."  Id.  The memorandum is silent as to any legal rationale for the Government's decision.  Id.  Following the issuance of this memorandum, KBR, in an e-mail, notified Plaintiff that it was no longer interested in purchasing the facility, citing the United States Government's classification of the DFAC as real property.  Am. Compl. Ex. 2.

In 2012, KBR purchased food service equipment and power generators used in the DFAC from KPCC, but did not purchase the DFAC, refrigeration, or dry storage equipment.  At the end of 2011, the Army excluded KPCC from the DFAC and utilized the buildings and equipment for its own purposes without making lease payments.  While parts of the base were turned over to the Government of Iraq in 2012, a smaller portion of FOB Warrior (C7), including the DFAC, continued to operate under United States military command.  Hr'g Tr. 189-192.

**Procedural History**

On February 11, 2015, KPCC filed suit against KBR in Texas state court claiming breach of the 2010 subcontract, fraud, and promissory estoppel.  Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs., Inc., No. H-15-0754, 2016 WL 1259518, at *1 (S.D. Tex. Mar. 31, 2016).  In its suit, KPCC contended that its subcontract with KBR required KBR to lease the DFAC constructed on FOB Warrior (C7) and all the equipment needed to operate it from KPCC and that the subcontract gave KBR the option to purchase the DFAC on behalf of the United States.  Id.  The action was later removed to the United States District Court for the Southern District of Texas.  On March 31, 2016, the District Court granted KBR's motion to dismiss for lack of subject-matter jurisdiction, finding that the political question and act-of-state doctrines rendered the matter nonjusticiable.  Id. at *22.  The District Court found that KBR "negotiate[ed] leases or purchases on behalf of the government", that the United States "specifically directed and controlled KBR's actions in its ongoing discussions with KPCC" to purchase the DFAC, and that "KBR has

established that it acted pursuant to a federal officer's [Army contracting officer Kathie Potter] directions" in regards to KBR's ultimate decision not to purchase the DFAC.[3]  Id. at *11.

KPCC appealed to the United States Court of Appeals for the Fifth Circuit, and while the appeal was pending, KPCC filed its complaint in this Court on February 15, 2017.  Kuwait Pearls Catering Company, WLL v. Kellogg Brown & Root Services, Inc., 853 F.3d 173, 175 (5th Cir. 2017); ECF 1.  On March 27, 2017, the Fifth Circuit vacated the District Court's dismissal order, finding that KPCC's claims were not barred under the political question doctrine.  Kuwait Pearls, 853 F.3d at 180-85.  The Fifth Circuit held that the case was justiciable because resolution of KPCC's dispute with KBR did not require reexamination of the Government's decision to transfer the DFAC to Iraq, and that judicially manageable standards existed to resolve the parties' contractual disputes and any determination of damages.  Id. at 180-82.

Concurring in part and dissenting in part, Judge Costa suggested KPCC could pursue an action against the United States in this Court:

> The appropriate recourse is for Kuwait Pearls to pursue the remedy that the law provides when the government takes property to further its own interests: a takings claim. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."). Although the outcome of that litigation in the Court of Federal Claims would be uncertain (it always is in litigation), it at least appears that Kuwait Pearls would be able to assert the takings claim as a third-party beneficiary of KBR's contract with the military.  See Global Freight Sys. Co. W.L.L. v. United States, 2016 WL 7488356 (Fed. Cl. Dec. 29, 2016).  Importantly, that litigation would not raise doubts about the propriety of the military's decision; it would consider only whether that decision makes the government liable for just compensation . . . .

Id. at 189-90.

The Fifth Circuit remanded the case to the District Court, which stayed that action pending resolution of this case.  Id. at 185.  This Court held an evidentiary hearing on the Government's motion to dismiss on May 9, 2018,[4] and the parties completed briefing on March 4, 2019.

## Discussion

---

[3]     The Fifth Circuit's reversal of the district court's decision did not disturb these findings which supported removal of the case, an issue KPCC did not appeal.  See Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs., Inc., 853 F.3d 173, 178 (5th Cir. 2017) ("KPCC challenges only the dismissal . . . the remand-denial is not contested.").  See Kuwait Pearls, No. H-15-0754, 2016 WL 1259518, at *11.

[4]     The following witnesses testified: Frederick Nolton Bull, Jr., Senior Manager of Procurement, Subcontracts, KBR, Inc., Norm Napier, business development and contract manager for U.S government contracts with Tamimi Global, Paul McVinney, director of staff in the Strategic Planning Directorate, United States Air Force, and Kathie Potter, former procuring contracting officer for LOGCAP III, now retired.

## Jurisdiction and Standard of Review

The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress." 28 U.S.C. § 1491(a)(1) (2012). "The Tucker Act itself does not create a substantive cause of action . . . ." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005). If a claim is to fall within the Court's Tucker Act jurisdiction, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." Aviation & Gen. Ins. Co., Ltd. v. United States, 121 Fed. Cl. 357, 361-62 (2015) (citing Fisher, 402 F.3d at 1172). "It is well-established that the Takings Clause of the Fifth Amendment is a money-mandating source of law for purposes of Tucker Act jurisdiction." Aviation & Gen. Ins. Co., 121 Fed. Cl. at 362 (citing Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1309 (Fed. Cir. 2008)).

## Legal Standards

Plaintiff must first establish subject-matter jurisdiction before the Court may proceed to the merits of the action. Hardie v. United States, 367 F.3d 1288, 1290 (Fed. Cir. 2004). The Court must dismiss the action if subject-matter jurisdiction is found to be lacking. Adair v. United States, 497 F.3d 1244, 1251 (Fed. Cir. 2007). The Court assumes all factual allegations as true, and will construe the complaint in a manner most favorable to the plaintiff when ruling on a motion to dismiss pursuant to Rule 12(b)(1). Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006). A plaintiff must establish subject-matter jurisdiction by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Tindle v. United States, 56 Fed. Cl. 337, 341 (2003).

The Court may consider evidence and resolve factual disputes when evaluating whether it has jurisdiction over the challenged claims. Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (finding that fact-finding is proper when considering a motion to dismiss where the jurisdictional facts are challenged); Schultz v. United States, 92 Fed. Cl. 213, 218 (2010).

It is well settled that a complaint should be not be dismissed under Rule 12(b)(6) when a complaint contains facts sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [the] [f]actual allegations must be enough to raise a right to relief above the speculative level" and cross the line "from conceivable to plausible." Id. at 555, 570 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This plausibility standard "is not akin to a probability requirement," but requires more than a "sheer possibility" that the defendant has violated the law. Id. (internal citation and quotation marks omitted). The issue is "not whether a plaintiff is likely to prevail ultimately, but whether [it] . . . is entitled to offer evidence to support the claims." L-3 Comm.'s Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 466 (2007) (alterations in original) (internal citation and quotation marks omitted).

The Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. Thus, when the Government takes private property for a public purpose, it must pay the owner just

compensation.  See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005) (finding that "where [G]overnment requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation.") (internal citations and quotation marks omitted).  The Takings Clause applies where the Government takes property located abroad that is owned by United States citizens.  See Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (holding United States citizens could assert Fifth Amendment taking claim for property located in El Salvador); Seery v. United States, 127 F.Supp. 601, 603 (Ct. Cl. 1955) (holding naturalized United States citizen was entitled to compensation under the Fifth Amendment for property located in Austria.  Nonresident aliens may also bring takings claims for property located inside the United States and its territories.  See Russian Volunteer Fleet v. United States, 282 U.S. 481, 489-92 (1931) (holding Russian corporation could bring claim for a taking of its ship located in New York harbor).

For a takings claim to survive a 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts to establish that it has a cognizable interest in the relevant property and that the property interest was "taken."  Aviation & Gen. Ins. Co., 121 Fed. Cl. at 362.  Further, the property must have been taken for public use.  Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1583 (Fed. Cir. 1993).

## KPCC's Substantial Connections with the United States Permit It to Assert a Fifth Amendment Takings Claim

In order to maintain a claim for a Fifth Amendment taking of foreign property, foreign plaintiffs must allege "substantial connections" with the United States.  See Atamirzayeva v. United States, 524 F.3d 1320, 1329 (Fed. Cir. 2008).  The Government contends that KPCC, a Kuwaiti corporation whose appropriated property was located in Iraq, lacks standing to bring a taking claim because it has not alleged the required substantial connections with the United States.  Def.'s Mot. 9-10.  In United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), the Supreme Court emphasized that a plaintiff's contacts with the United States must be voluntary in order to meet the requirement.  Id. at 271.  In Verdugo-Urquidez, the Court held that a Mexican national claiming an illegal search of his residence in Mexico lacked substantial connections with the United States to bring his claim.  494 U.S. at 271.  The Court rejected "the view that every constitutional provision applies wherever the United States Government exercises its power."  Id. at 268-69.  The respondent, accused of leading a Mexican cartel smuggling narcotics into the United States, had been arrested by Mexican authorities in Mexico and then was transported to the United States for prosecution.  Id. at 262.  The Court found that, unlike resident aliens or illegal aliens who entered the United States voluntarily, the respondent "had no previous significant voluntary connection [prior to his extradition] with the United States," and as such, lacked substantial connections sufficient to claim Fourth Amendment protections.  Id. at 271-73.

The Federal Circuit applied Verdugo-Urquidez and analyzed "substantial connections" in a Fifth Amendment takings context in Atamirzayeva v. United States, 524 F.3d 1320 (Fed. Cir. 2008).  The Court affirmed the trial court's finding that the plaintiff, a citizen of Uzbekistan, failed to allege substantial connections with the United States.  The plaintiff owned a cafeteria located next to the United States Embassy in Tashkent, Uzbekistan and claimed that the United States Government directed the authorities of Uzbekistan to seize her cafeteria to increase the Embassy's security.  Id. at 1321.  The plaintiff did not plead any other connection with the United States.  See id. at 1326.  Instead, she relied on Turney v. United States, 126 Ct. Cl 202 (1953), where the Court

of Claims ruled that a Philippine company had standing to bring a taking claim for property located in the Philippines. 126 Ct. Cl. at 217. The plaintiff in Atamirzayeva argued that Turney "does not require a non-resident alien to show any connection to the United States in order to assert a taking claim for overseas property." Atamirzayeva, 524 F.3d at 1326. The Federal Circuit disagreed with the plaintiff and readily distinguished Turney, finding that the plaintiff corporation in Turney had "three significant connections" with the United States:

> First, the corporation had been formed by two United States citizens. Second, the corporation received its ownership interest in the surplus property by assignment from those United States citizens. Third, after liquidation of the corporation, a United States citizen was appointed as the liquidating trustee and the plaintiff in the Court of Claims action.

Atamirzayeva, 524 F.3d at 1328 (Fed. Cir. 2008).

Thus, the Federal Circuit in Atamirzayeva reiterated that foreign plaintiffs seeking compensation for takings of their property are required to allege substantial connections with the United States and found that Turney provided an example of sufficient connections. See id. The Federal Circuit held that because the plaintiff in Atamirzayeva had failed to plead "any relationship, business or otherwise, with the United States," she had not adequately alleged substantial connections. Id. at 1327-28. (emphasis added). Here, unlike the plaintiff in Atamirzayeva, KPCC has established its voluntary business connections with the Army and direct involvement serving the United States military. KPCC provided a DFAC and dining services directly to the United States military, on a United States base, under its subcontract with KBR, a United States corporation. Pl.'s Ex. 46 at 4. The United States was named as the "Client" in KPCC's subcontract with KBR, and a Government official approved the subcontract. Pl.'s Ex. 46 at 4; Hr'g Tr. 102. The DFAC and dining services KPCC provided were funded through KBR's prime contract with the United States. Hr'g Tr. 93-94, 147.

KPCC's contacts with the United States extended beyond funding. The subcontract required KPCC to give the United States substantial control over its activities on the military base. The subcontract limited KPCC's management of the DFAC and curtailed its autonomy to make business decisions. As the United States had "complete control over who went into the base, at any time, and what went into the base," the United States required KPCC employees obtain background checks and badges to access FOB Warrior (C7). Hr'g Tr. 18, 154, 157. The United States determined both the menus at the DFAC and the suppliers from whom KPCC could purchase. Id. at 168. The United States restricted the access of the local labor force KPCC hired to perform the contract on the base. Id. at 157. Norm Napier, Tamimi Global's business development and contract manager for United States government contracts, testified that "the U.S. government set the rules that both the contractor and the subcontractor had to follow." Id. at 158.

Tamimi Global was a "preferred vendor" and the Government relied heavily on KPCC and Tamimi Global to feed United States troops in both Iraqi wars. Hr'g Tr. 15, 130. KPCC has a long history with the United States Government and is in direct privity of contract with the United States Government on various other contracts. Id. KPCC submitted to United States laws in constructing the DFAC and providing services under the Facility Agreement, including the Foreign Corrupt Practices Act and regulations and standards from the Occupational Health and Safety Administration. Hr'g Tr. 144-45, 152-54; Pl.'s Ex. 46 at 2, 13. Finally, KPCC has alleged that

United States officials were directly involved in, and in fact directed, the classification of the DFAC as real property and the exclusion of KPCC from its property.  Am. Compl. ¶¶ 13-18.

In sum, based on the record as a whole, KPCC has established it has substantial connections with the United States sufficient to assert a claim for compensation under the Takings Clause.

KPCC alternatively argues that this Court should extend the Supreme Court's analysis in Boumediene v. Bush, 553 U.S. 723 (2008), to find that KPCC has standing to assert a Fifth Amendment taking claim.  Pl.'s Supp. Br. 5.  Though the Supreme Court applied constitutional protections under the Suspension Clause to aliens detained at the United States Naval Base in Guantanamo Bay in Boumediene, it has never extended that holding to apply other constitutional provisions to aliens.  Id. at 798.  The Suspension Clause limits suspension of habeas corpus to circumstances of rebellion or invasion.  U.S. Const. art. I, § 9, cl. 2.  In Boumediene, the Supreme Court held that the Suspension Clause applied to aliens detained at Guantanamo Bay and that they could bring writs of habeas corpus.  553 U.S. at 798.  The Court cited the unique function and importance of the writ, its history dating back to the Magna Carta, the citizenship and status of the detainees, the nature of the sites where the detainees were apprehended, and the practical difficulties of determining their entitlement to the writ.  Id. at 740-67.  The Boumediene Court exclusively applied the Suspension Clause and did not address whether other constitutional provisions could extend to aliens overseas.  See id.

Most Circuits have limited Boumediene to the Suspension Clause.  See, e.g., Bahlul v. United States, 840 F.3d 757, 796 (D.C. Cir. 2016) (en banc); Hernandez v. Mesa, 885 F.3d 811, 817 (5th Cir. 2018); Igartua v. United States, 626 F.3d 592, 600 (1st Cir. 2011).  However, in Rodriquez v. Swartz, the Ninth Circuit relied on Boumediene to extend Fourth Amendment protections when a U.S. Border Patrol agent on American soil shot across the U.S.-Mexico border and killed a Mexican national in Mexico.  899 F.3d 719, 729-34 (9th Cir. 2018).  The Ninth Circuit noted the "many reasons not to extend the Fourth Amendment willy-nilly to actions abroad," but held the alien had Fourth Amendment protection "under the particular circumstances of this case" because the agent "acted on American soil subject to American law."  Id. at 731.  Though a Fifth Amendment claim had been raised earlier and dismissed by the district court, the Ninth Circuit specified that its holding did not analyze the applicability of the Fifth Amendment.  Id. at 734.

In Hernandez v. United States, 785 F.3d 117 (5th Cir. 2015), the Fifth Circuit declined to interpret Boumediene as extending Fifth Amendment protections to an alien overseas.  The Hernandez court stated: "nothing in [Boumediene] presages . . . whether the Court would extend the territorial reach of a different constitutional provision—the Fifth Amendment—and would do so where the injury occurs not on land controlled by the United States, but on soil that is indisputably foreign and beyond the United States territorial sovereignty."  Id. at 121.

Although Boumediene did not extend the Fifth Amendment to foreign subcontractors working on United States bases overseas, such an extension could provide an alternative basis for permitting KPCC's suit here.  However, as the Federal Circuit has not addressed whether Boumediene extends any Constitutional protections other than the Suspension Clause to aliens overseas, this Court does not rely on Boumediene and limits its decision, granting standing based on KPCC's substantial connections with the United States.

**KPCC Sufficiently Alleged the Existence of a Cognizable Property Interest**

The Government asks the Court to dismiss KPCC's taking claim pursuant to Rule 12(b)(6) because KPCC failed to plausibly allege that it possessed a cognizable property interest that was taken by the United States Government. Def.'s Mot. 2, 15. The Government argues that KPCC failed to establish the source of its ownership interest in the DFAC. Def.'s Mot. 17. Further, the Government claims it did not "take" KPCC's interest in its contract with KBR because the United States did not acquire KBR's contract rights or obligations, and because KPCC is still enforcing its interest in the contract through its breach of contract claim against KBR in the Southern District of Texas. Def.'s Mot. 18-21.[5]

"'A taking can occur simply when the Government by its actions deprives the owner of all or most of his interest in his property, and [t]here can be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person's property.'" Langenegger, 756 F.2d at 1570 (quoting Aris Gloves, Inc. v. United States, 190 Ct. Cl. 367, 374 (1970). In defining required property interests to effect a taking, courts rely upon "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law." Aviation & Gen. Ins. Co., Ltd., 121 Fed.Cl. at 362 (quoting Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003)).

As the Supreme Court has recognized, a taking is effected when the United States Government authorizes a permanent physical occupation of property. See Skip Kirchdorfer, Inc., 6 F.3d 1573, 1582 (Fed. Cir. 1993) (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434–35 (1982)). Additionally, contract interests under the Takings Clause have been classified as protected property interests. See, e.g., Lynch v. United States, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.") (citing United States v. Central Pacific R. Co., 118 U.S. 235, 238 (1886)).

KPCC was contractually entitled to, and received, lease payments from KBR for the use of the DFAC. Pl.'s Ex. 46 at 7; Hr'g Tr. 113, 115. KPCC's subcontract with KBR also provided an option for KBR to purchase the DFAC from KPCC. Pl.'s Ex. 46 at 7. The United States Government approved this subcontract. Hr'g Tr. 102. Tamimi Global built the DFAC using its own funds. Hr'g Tr. 131-32. Based on the facts of record, KPCC has established a cognizable property interest: its interest in its tangible, moveable property--the DFAC and associated equipment.

**KPCC's Claim is Not Barred by Section 1502 As It Does Not Grow Out of or Depend Upon the SOFA**

The Government also asserts that KPCC's claim is barred by 28 U.S.C. § 1502 (2012). This statute provides that "[e]xcept as otherwise provided by Act of Congress, the United States Court of Federal Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502. The

---

[5]     To the extent that KPCC argues the Government may have taken KPCC's contract rights, KPCC does not seek any damages for the alleged taking of those rights. See Am. Compl. ¶¶ 14, 20, 33. As pleaded, any claim for taking of contract rights is subsumed into KPCC's claim for the taking of the DFAC and associated equipment.

parties do not dispute that the SOFA falls within the broad interpretation of the term "treaty" under Section 1502.  See Hughes Aircraft Co. v. United States, 534 F.2d 889, 903 n.17 (Cl. Ct. 1976) (equating international executive agreements with treaties for the purposes of Section 1502).

"Section 1502 has been given a narrow interpretation; its applicability is limited to those cases relying so heavily on a treaty that, but for the treaty, the plaintiff's claim would not exist." Wood v. United States, 961 F.2d 195, 199 (Fed. Cir. 1992).  Section 1502 divests the Court of jurisdiction where "the right itself, which the petition makes to be the foundation of the claim . . . [has] its origin – derive[s] its life and existence – from some treaty stipulation." United States v. Weld, 127 U.S. 51, 57 (1888); Hughes Aircraft Co., 534 F.2d at 903-04 ("The test under Section 1502 is whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty.").

According to the Government, Section 1502 divests this court of jurisdiction over KPCC's taking claim because KPCC's claim grows out of or depends upon the terms of the SOFA.  Because KPCC must prove its ownership of the DFAC as a prerequisite to bringing its taking claim, the Government contends that "KPCC would need to demonstrate that under the terms of the SOFA, the [DFAC] was relocatable property, and not a building . . . [a]s a result, KPCC's takings claim derives its 'life and existence' from the SOFA." Def.'s Mot. 14.  In so arguing, the Government attempts to extend what it means for a claim to grow out of or depend upon a treaty or applicable agreement.

A case grows out of or depends upon the terms of a treaty or executive agreement when it involves rights "given or protected by" the treaty or executive agreement.  United States v. Old Settlers, 148 U.S. 427, 468 (1893).  Courts have applied this requirement literally--the treaty must create or protect the right at issue.  See Wood, 961 F.2d at 200 (dismissing Section 1502 jurisdictional challenge where the treaty did not create the right to purchase a certificate of airworthiness); Hughes Aircraft Co., 534 F.2d at 906 (finding cause of action did not grow out of or depend upon an international agreement when the agreement did not create plaintiff's right to bring its cause of action).  It is insufficient that a defendant's defenses may rely upon a treaty or agreement, or even that resolution of the claim may depend upon judicial interpretation of a treaty or agreement.  See S. N. T. Fratelli Gondrand v. United States, 166 Ct. Cl. 473, 478 (1964) (holding that a claim does not grow out of a treaty when the Government "brings the Treaty to the fore as a defense" and that Section 1502 "permits the court to pass upon a treaty issue raised as a defense to a claim which is independent of the treaty . . . [Section 1502] is not framed, nor has it been applied, as forbidding this court to construe or apply a treaty."); see Wood, 961 F.2d at 200.

Here, the Government relies upon the SOFA as a defense, and KPCC's claim for just compensation is not derived from the SOFA, as the SOFA did not "give or protect" any rights KPCC held in the DFAC.  Thus, KPCC's taking claim does not grow out of or depend upon the SOFA.  It is well established that this Court has the authority to construe the SOFA.  See Hughes Aircraft Co., 534 F.2d at 895-906 (construing an international executive agreement between the United States and United Kingdom to determine whether plaintiff's claim "grew out of" the agreement under Section 1502); Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S 221, 230 (1986) (holding that "courts have the authority to construe treaties and executive agreements"); Wood, 961 F.2d at 200 ("[T]he Claims Court is free to construe or apply a treaty because it has jurisdiction over cases in which the government's action may be judged against a treaty.") (internal citations omitted).

12

Section 1502 does not prohibit this Court from determining whether the DFAC was relocatable and thus covered by the SOFA.  The SOFA transferred to the Government of Iraq "buildings, non-relocatable structures, and assemblies connected to the soil," but provided "United States contractors shall retain title to all equipment, materials, supplies, relocatable structures, and other movable property." Def.'s Mot. App. 2-6.  Based upon record evidence, the Court finds that the DFAC was a relocatable, movable structure under the SOFA.  The DFAC was a temporary and portable structure that could be assembled and disassembled as needed.  Hr'g Tr. 120, 164-65, 220.  The DFAC could be demobilized: KPCC's subcontract provided for the DFAC's demobilization and removal, and the Army itself discussed its removal in the months leading up to the Army's reclassification.  Pl's Ex. 46 at 5-7, 8, 11; Pl.'s Ex. 17 at 1.  KBR's Senior Manager of Procurement for Subcontracts, Mr. Bull, testified that the Army had removed and reassembled two similar DFACs in 2010, including one from the same base as KPCC's DFAC.  Hr'g. Tr. 79-88.  When the Army made its decision that KPCC's DFAC was nonrelocatable in October 2011, the United States Department of State was removing and reassembling a similar DFAC on a United States military base in Iraq.  Id. at 83.  Because the DFAC was a relocatable structure, it was not covered by the SOFA.

**KPCC's Claim is Justiciable**

Finally, the Government argues that this case presents a nonjusticiable political question because KPCC is attempting to "second-guess the SOFA that the President entered into with the Iraqi Government." Def.'s Mot. 21.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n, 478 U.S. at 230.  "The nonjusticiability of a political question is primarily a function of the separation of powers." Baker v. Carr, 369 U.S. 186, 210 (1962).  However, "[t]he presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine." I.N.S. v. Chadha, 462 U.S. 919, 942–43 (1983).  The Federal Circuit has cautioned that "the decision that a question is nonjusticiable is not one courts should make lightly." El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1362 (Fed. Cir. 2004).

Under the factors articulated by the Supreme Court in Baker, a political question is present if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department or a lack of judicially discoverable and manageable standards for resolving it." 369 U.S. at 217.  The Government argues that a political question is present under both factors here because issues of foreign affairs have been textually committed to the executive branch and there is a lack of judicially discoverable and manageable standards to resolve KPCC's claim.  Def.'s Mot. 24 n. 10.  In so arguing, the Government misconstrues KPCC's claim.  At issue in this case is whether the Government effected a taking of KPCC's property, entitling KPCC to just compensation.  What is not at issue is the wisdom of the SOFA itself, nor the executive branch's decision-making regarding foreign relations.  Consideration of taking claims is "clearly the role of the judiciary according to the Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function . . . and the Constitution does not provide for a foreign affairs exception." Langenegger, 756 F.2d at 1569.

Finally, a takings claim seeking just compensation is a "legal question for which we have judicially discoverable and manageable standards for resolution." Aviation & Gen. Ins. Co., Ltd. v. United States, 882 F.3d 1088, 1095 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 412 (2018). "The guiding principle of just compensation is reimbursement to the owner for the property interest taken." United States v. Va. Elec. & Power Co., 365 U.S. 624, 633 (1961). Accordingly, there are judicially manageable standards governing resolution of KPCC's claim.

## **Conclusion**

Defendant's motion to dismiss is **DENIED**. The Court will conduct a telephonic status conference on **October 22, 2019**, at **2:00 P.M. EST**.

 s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**